Moncure, J.,
delivered the opinion of the court:
There are two persons now claiming to be mayor of the city of Richmond and acting as such; George Ohahoon and Henry E. Ellyson; and these two cases of habeas corpus, instituted by persons arrested by the warrant of these two claimants respectively, have, by an amicable arragnement between them, been instituted for the purpose of obtaining the opinion of this court upon the question, which of them is lawful mayor of the city?
This is a deeply interesting question, not only to the city of Richmond, but to the State at large; and its importance, and the necessity of an early decision of it, has induced the court to take up the cases for hear *697 ing at the earliest possible moment, in order that the question involved may be decided as soon as possible, consistently with a proper examination and considera-' tion of it. ¥e have fully heard the argument of able counsel on both sides of the question, and have given to it' all the consideration of which we are capable. The result of our deliberations!! will now proceed to announce:
There cannot be two mayors of the city of Richmond at one and the same time. If Chahoon is mayor, Ellyson is not; or if Ellyson is mayor, Chahoon is not.
Chahoon claims to be mayor by virtue of an appointment as such in 1868, by General Schofield, then military commander of the district of Virginia, acting under what are called the Reconstruction Acts. And he also claims that his authority is confirmed by the constitution of the State, and even by what is called the Enabling Act itself, which he admits is to that extent constitutional. But he insists that that act is unconstitutional so far as it essays to authorize and provide for the appointment of another person as mayor. On the other hand, Ellyson claims to be mayor by virtue of an appointment made in pursuance of that act.
The whole question, therefore, resolves itself into this: Is the Enabling Act, or at least that part of it under which Ellyson received his appointment, unconstitutional? "We confine ourselves to Lhat part of the act, because it is the only part which necessarily comes under consideration in these cases. There is another part of the act, to wit: The provisos in the 2d section, which subject any judgment, decree or order made by the Court of Appeals at the term thereof, commencing on the 11th day of January 1870, to the supervision and control of the Court of Appeals organized under the constitution; upon the question, as to the constitutitionality of which, we understand this court will soon *698 "be called upon to decide; and we wish, therefore, not to prejudge that question, even collaterally.
This court, undoubtedly, has power to declare an act of the legislature to be unconstitutional and void; and js tbe duty of the court to do so in a proper case. It J 1 *- is, however, a very delicate power, to be exercised very carefully; and before an act of the legislature is annulled as unconstitutional, the court should be well satisfied that it is so. Prima facie, every act of the legislature is constitutional, and the burden of clearly showing the contrary devolves on him who asserts it. If the question be doubtful, it will be solved in favor of the validity of the act. The members of the legislature and the governor are elected by the people, and are presumed to be both intelligent and patriotic. Before entering upon the discharge of their duties, they take an oath to support the constitution of the State- and of the United States; and it is not to be presumed that they would unite in passing and approving an act without being well satisfied that it is constitutional.
The preamble of the enabling act, which was approved March 5th, 1870, is in these words: “Whereas, grave doubts have arisen as to the right of the civil officers of the Commonwealth, the governor, attorney general, lieutenant governor, and members of the general assembly excepted, to continue to hold their offices, and to exercise the powers, perform the duties and enjoy the privileges and emoluments appertaining to the same, and as to the legality of their acts as such officers, since the admission of the State as one of the co-equal States of the American Union; and whereas, the failure to recognize the official acts of such officers as legal, and their -removal from office at this time, would cause great confusion and embarrassment throughout the State: Therefore,”
Then follow the 18 sections of the act; the 1st of which, recognizes as legal, all such officers described in *699 the preamble who are eligible to office under the existing constitution and laws of Virginia, and who qualified on or before the 26th day of January 1870 (the day on which the State was admitted to representation in congress); provided that all officers of whom bonds are required by law for the proper discharge of their respective duties, should give or renew their bonds with good security within the time and in the mode therein prescribed. The 2d section legalizes the acts heretofore done by such officers and otherwise lawful, subject to the proviso in regard to any judgment, decree or order made by the late Court of Appeals as before referred to. The 3d section relates to the filling of vacancies in the office of justice of the peace and constable now existing, or which may hereafter accrue, before an election for such officer shall be held under the constitution. The 4th section vacates the offices of circuit and county clerks at the first term of their respective courts hereafter held by judges elected under the present constitution, and authorizes each one of such judges at the first term of his court to appoint a clerk for said court to continue in office until his successor shall be regularly elected and qualified; vacates the offices of attorneys for the Commonwealth and sheriffs at the first term of the County courts hereafter held by judges elected under the present constitution in their respective counties; and authorizes such judges then to appoint attorneys for the Commonwealth and sheriffs for their respective- counties, to continue in office until their successors are elected and qualified under the constitution ; and provides for the execution of bonds áceording to law by the sheriffs and clerks appointed under this section. The remaining sections, except the last, which merely declares the act to be in force from its passage, more immediately concern the question now under consideration; and will, therefore, be set out in full. They are as follows:
*700 “5. That for the more efficient government of the cities and towns of the. Commonwealth, the governor of this State shall, as soon as practicable, appoint as many couneilmen or trustees for each city and town, now entitled to trustees or couneilmen, as are now pro- ' vided by law.
“6. The couneilmen and trustees, now exercising the . functions of such offices, may continue in such offices till the couneilmen and trustees appointed, as provided in the foregoing section, shall qualify, and no longer; and shall fill vacancies in their respective bodies occurring during their continuance in office.
“7. In all cities and towns, the couneilmen or trustees appointed by the governor, as hereinbefore prescribed, shall have authority, and are hereby required, to appoint all municipal officers, except judges and officers of the courts hereinafter provided for in their respective cities and towns, who shall have all the powers, and discharge all the duties now conferred and required by law upon such municipal officers.
“ 8. All persons now exercising the functions of the aforesaid municipal offices may continue in such offices till their successors are appointed and qualified, as herein provided, and no longer.
“ 9. The officers appointed, in pursuance of this act, shall continue in office until their successors, elected under the constitution of this State, are duly qualified.
“ 10. Every person appointed, as herein prescribed, shall take the oaths of office required by law; shall give bond in such penalty and with such security as existing laws may provide for officers holding like offices, and shall receive such compensation as existing laws may provide in like cases.
“ 11. The judges of the Corporation and Circuit ^^oúrlsTandCourts of probaSj hereafter elected for the said towns and cities of the Commonwealth, shall appoint the officers of their respective courts, to continue *701 in office until their successors are elected and qualified, as provided by law. The sheriffs, clerks and other officers required to give bond, appointed under this section, shall not enter upon the discharge of their respective duties until they shall have given bond according to law; and in case of the failure of any such officer to give such bond, within twenty days after his appointment, the said appointment shall be vacated, and the aforesaid court shall proceed to appoint his successor with like powers, and subject to like limitations, as herein provided.
“ 12. This act shall not be construed so as to deprive the general assembly of the right to remove any and all officers at present holding offices in this State, or who maybe hereafter appointed under the provisions of this act; or to adopt such other measures for filling vacancies in offices which now exist, or may hereafter occur, as to it may seem right and proper.”
Under this act and in strict pursuance of the terms thereof, the governor appointed councilmen for the city of Richmond, who appointed Ellyson as mayor; and he accordingly took the oaths required by law and proceeded to execute the duties of the office. At the time of his appointment and qualification, Chahoon was acting as mayor, under the appointment of Gen. Schofield, as before stated.
Had the legislature constitutional power to pass this act, so far as it relates to the subject of the present enquiry ?
The act may be unconstitutional, either because it is contrary to the constitution of the United States or the laws made in pursuance thereof, being the paramount and supreme law of the land; or because it is contrary to the constitution of the State of Virginia.
The counsel for Chahoon contend that it is contrary to both — The counsel for Ellyson that it is contrary to neither.
*702 There is certainly nothing in the constitution itself of the United States to which this act can be opposed. there anything in any law of congress made in pursuance of the constitution of theUnited States to which it is opposed?
j£ ^ere any thing in any such law, it is in the acts of congress commonly called the Reconstruction Acts, or in the act admitting the State to representation in congress.
The Reconstruction Acts certainly subjected the State to the military authority of the United States. But they were limited in their operation; and it was expressly declared in the first of them, to wit, the act of March 2, 1867, to which the others are merely supplementary, that it should be inoperative in said State when and after the State shall be declared entitled to representation in congress, and senators and representatives shall be admitted therefrom on their taking the oath prescribed by law. The State was declared entitled to representation in congress by an act passed January 26, 1870, and her senators and representatives were thereupon admitted therefrom on their taking the oath prescribed by law. So that, by the very terms of the Reconstruction Acts, they have become inoperative in the State. They were enacted only for a purpose, which has been fully accomplished.
"We can see nothing in the Reconstruction Acts which can give to Chahoon, the appointee of the military commander, any right to continue to hold the office of mayor against Ellyson, the appointee under the Enabling Act of the State. The authority of the military commander of Virginia ceased when her representatives were admitted into congress, and when his authority ceased that of his appointees also ceased. It would be strange if, after the principal ceased to have any authority, his subordinate agents should continue to have authority.
*703 Then as to the act admitting the State to representation in congress. This act provides “that before any member of the legislature of said State shall take ° m m resume his seat, pr any officer of said State shall enter upon the duties of his office, he shall take and subscribe,” &c., a certain oath therein set out. And further pi’o vides “ thatevery such person who shall neglect for the period of 30 days next after the passage of this act, to take, subscribe and file such oath as aforesaid, ■shall be deemed and taken, to all intents and pui’poses, to have vacated his office.”
It is argued that this act i-ecognizes, and in effect declares, the right of persons who had received appointments to office from the military commander, and continued to perform the duties of such office until the passage of the act, to hold over until their successors are appointed and qualified; and that this is one of the fundamental conditions on which the State was' admitted to representation in congress.
We do not think so. Congress, in the'passage of this act, had not in its mind the question, whether such persons would be entitled to hold over or not, and much less did it intend to give them authority to do so. Its manifest and only object was to require every member of the legislature before taking or resuming his seat, and every other officer of the State before entering upon the duties of his office, to take the oath prescribed by the act. It was properly left to the State to determine who were or should be her officers. It is true, the second proviso declares vacant the office of every such person who shall neglect for the period of 30 days, next •after the passage of the act, to take, subscribe and file such oath; but this only imposes a penalty for the failure to comply with the previous provision.
Certainly congress did not intend that any person who might have been appointed by the commander of a militaiy district, to pei’form the duties of an office *704 therein, should have any right under the constitution and laws United States to continue to perform duties after the cessation of all military authority . in such district, and after it was fully restored to its p0sition as a sovereign State of the Union; did not in- * tend that the legislature, the representative of the sovereignty of the State, subject only to a few constitutional restrictions, should not have power to enact a law appointing another agency than the one which had been used by the military commander to perform the duties of an office during the short interval between the period of the restoration of the State and the day fixed in the constitution for filling the office. These appointees of the military commander received their appointments with full knowledge that their authority might be terminated at any time, not only by the will of such commander, but by the cessation of military power in the State, andher re-admission to all her sovereign rights. Chahoon received his appointment on the 4th of May 1868, and might have had to give it up the next day. He actually held it for nearly two years, during which the state of things existing when he received it continued ; and he even continued to perform its duties and receive its emoluments after the state of things had ceased, and until another person was appointed under the authority of the State to take his place. Surely he can have no cause to complain that any right which he has under the constitution or laws of the United States has been violated. If he has a valid claim, it is under the constitution or laws of the State of Virginia. And this brings us to the next question :
Is there any thing in the constitution of the State to which the Enabling Act, or so much of it as we now have under consideration, is opposed?
It is supposed by the counsel of Chahoon to be opposed to the 25th section of the 6th article of the constitution, which declares, that “judges, and all other *705 officers elected or appointed, shall continue to discharge the duties of their offices after their terms of service have expired until their successors have And it is contended that' the persons who were performing the duties of the different offices of the State _ . . . at the time of her admission to representation, in congress, under appointments previously made by the military commander, are “ officers,” in the meaning of that section, and entitled as such to hold their offices until their successors have qualified.
"We do not think so. We think the section was plainly intended to apply only to officers elected or appointed under the constitution, and for whose election or appointment it provides. It was literally copied, except in the omission of a single word, from a section in the constitution of 1864, commonly called the Alexandria constitution, which section was itself literally copied, with a like exception, from the constitution of 1851, in which constitutions it plainly had the same meaning; and it was considered necessary by the framers of those constitutions, notwithstanding the insertion of such a section, to provide expressly, as they did in the schedules thereto annexed, that all persons in office at the time of the adoption of said constitutions, except as therein otherwise expressly directed, should continue in office “until their successors are qualified,” in the language of the constitution of 1851, or “ until their present terms expire,” in the language of the constitution of 1864. In the constitution of 1830, article 7, after providing for the case of the governor and privy councillors, further provides, that “ all other persons in office, when this constitution shall be adopted, except as is herein otherwise expressly directed, shall continue in office till successors shall be appointed, or the law shall otherwise provide.” It was considered necessary by some of the ablest men in the distinguished body, which *706 framed, that constitution, to adopt such a provision, in order to authorize officers acting under the old constitution, when it ceased to operate, to continue to act under the new, when its operations commenced; and. the provision in the 7th article was accordingly adopted. The conventions which framed the constitutions .of 1851 and 1864, followed, in this respect, the precedent -of their illustrious predecessor. If the necessity of such a provision, in order to the continuance of the authority of the old officers, was a question of doubt when the constitution of 1881 was framed, and was solved on that occasion, by assuming that there was such a necessity, and acting upon the assumption by adopting the provision, surely after this precedent had been followed by two succeeding conventions, when the framers of the present constitution adopted that instrument, and carefully omitted such a provision, while xhey copied from the constitutions of 1851 and 1864, the section before referred to in regard to “judges and all other officers,” it may be fairly presumed that they did not intend to include in the word “officers,” used in that section, persons who were performing the duties of office at the time of the adoption of the constitution, especially when these persons were appointees or officers of a military provisional government. At all events, this is not so plain a question as to make an act of the legislature providing other agencies for the performance of these duties until the arrival of the period fixed by the constitution for the election or appointment of these officers, an unconstitutional and void act. The ■fact is, the section was plainly intended, in its very nature and by its very terms, to have only a prospective operation, and to be confined to officers elected or appointed under the constitutional machine after it had been set in motion. It provides for the case of officers “whose terms of service have expired;” that is, terms of service prescribed by the constitution, and not *707 for the case of officers acting under a prior government, whose terms of service under their appointments may not have expired, or who may have been appointed to no term of service at all, but during the mere pleasure of a military commander.
The case of Lawhorne, exparte, 18 Gratt. 85, relied on by the counsel of Chahoon in support of their views on this branch of the subject, can give them, we think, no support whatevei’. Governor Pierpoint was elected to his office under the constitution of 1864, which was received and recognized as the constitution of the State ' after the war, and thenceforward continued to be our only constitution until it was superseded by the present constitution. While that constitution was in force, Governor Pierpoint’s term of service under it expired; and the question arose, whether he was entitled to hold over under the aforesaid provision of the constitution; and that question depended alone upon the question, whether the “ governor” was an “ officer” in the meaning of that provision. To be sure we were then under a military government, and it may be said by some that during its existence the constitution of the State was suspended, and that Governor Pierpoint became a mere provisional officer. But certainly the counsel for Ohahoon do not say that the constitution was suspended; on the contrary, they maintain that there •never has been any such interregnum. However that may be, certain it is, that the question came up in Lawhome’s case, for decision by this court, whether, ac•cording to the true construction of that constitution, Governor Pierpoint was entitled to hold over as aforesaid. As was then well understood, this question was brought up for the decision of this court with the knowledge and approbation of General Schofield, then military commander of the State, who was willing, in this respect, to conform to the constitution of the State and the construction which might be put upon it by this court.
*708 Again, it is supposed that the act in question is contrary to the 20th section of the 6th article of the con-That section provides, among other things, “that there shall be chosen by the electors of every city a may°r>” > an(^ ^ is contended that by reason of this clause, a mayor of a city can only be chosen by the electors of such city, and, therefore, the act in ' question, providing for such an appointment otherwise, is unconstitutional and void, though the appointment was only for the short interval to elapse before the time prescribed by the constitution for making the regular election under the article, to wit: the 4th Thursday* in May next; or rather the time when the officers elected under that article are to enter upon their duties, to wit, the 1st day of July succeeding.
We think that this clause also, was plainly intended to apply only to a mayor to be chosen under the constitution at and after the time therein prescribed for that purpose, and not to one appointed to perform the duties of mayor before one could be chosen and enter upon the duties of the office under the constitution. Certainly an appointee under and by virtue of the Enabling act, could be no more objectionable on constitutional grounds, than an appointee of a military commander during the provisional government, holding over after that government had ceased to exist. The provision in the constitution for an election required time for its execution. A day was fixed for that purpose by the constitution with a view to afford such time; and until that day arrived there can be no election under the constitution. Indeed there would scarcely be time to make the necessary preliminary arrangements and make an election earlier. ITence the necessity of either permitting Chahoon to go on to perform the duties of the office until an election can be made, or providing otherwise by law for the case. That provision has been made by the Enabling Act; *709 and we think the constitutional competency of the legislature to make such a provision clearly existed. They might have pursued the other alternative, but they did think fit to do so.
There are other provisions of the same section to which it is contended the act in question is opposed. But the same answer applies to and concludes the objection, that all these provisions apply to elections or appointments to be made under the constitution, which could have no effect before the 4th Thursday in May or the 1st day of July succeeding, and not to elections or appointments which might be provided for by law to fill up the short interval before that time.
A great deal was said in the argument about the question whether there was a vacancy in the office or not, and the power of the legislature first to create and then to fill a vacancy; and it was contended by the counsel for Chahoon, that “ however startling the assertion of such a power in the assembly may be, it is in fact the only ground upon which the constitutionality of the act under consideration can be sustained.” The same counsel say, that “ the 22d section of the 5th article is the provision relied upon as granting this authority to the general assembly;” and they set out this section in their brief. But they contend that this section is prospective entirely in its operation, though they deny that the operation of the 25th section of the 6th article is entirely prospective.
Now whatever may be the true construction of the 22d section of the 5th article, which we deem it unnecessary now to decide, we think the power of the legislature to pass the enabling act does not at all depend upon that section; and that all the discussion about, whether there was a vacancy or not in these offices, and whether the legislature has a right first to create and then to fill a vacancy, is wholly beside the question we now have to decide. Whatever power these offi *710 cers may have had to continue to discharge the duties of their offices until otherwise provided by law, we are clearly of opinion that it was competent for the legislature to terminate their power, whether it was derived from common law principles, as was argued, or any otherwise, except under the constitution of the United States or of this State, under neither of which do we-think they have any power.
The State, upon her re-admission to representation in congress on the 26th of January 1870, came under the-control of the legislature, whose duty it then was to complete the organization of the government under the constitution. At that time, the only officers which had been elected under the constitution were the governor, attorney general, lieutenant governor and members of the general assembly. All the other civil offices of the State, which existed prior to the constitution, were filled, if filled at all, only by persons who had previously held them, most of -whom were military appointees. These persons continued to perform the duties of their offices after the re-admission of the State. But a very grave doubt arose whether they had any power to do so; and whether all their acts done under-such supposed power would not be regarded as null and void. It was considered by some that these officers had no such power, because there was no provision in the constitution, or the schedule annexed thereto, as-there had been on former occasions of the like kind, to authorize them to hold over; or because they were mere military appointees, whose power necessarily-ceased with the military government, from which they derived their power; or because the framers of the constitution actually intended that their power should cease, and that they should not hold over by virtue of their original appointment.
Uow, whether.these officers had power to hold over- ■or not, all will admit that legislation was proper and *711 necessary to clear up all doubt ontbe subject and place it on sucb a basis as would conduce to the welfare of the Commonwealth. The legislature so thought, and accordingly enacted the enabling act, the preamble of which, clearly and forcibly sets forth the motives and necessity for the act. The counsel for Chahoon admit, that to a certain extent, the legislature had power to pass this act, and it is wise and expedient, that is, to the extent that it confirms what had been previously done by these officers in the discharge of the duties of their offices, and to the extent that it confirms what might thereafter be done by them in the discharge of those duties during the period prescribed by the act. But the counsel deny that the legislature had power to provide for the appointment of any person to fill an office, the duties of which were at the time performed by a person holding over, under an appointment of the military commander; and especially had not power to enact the sections of the enabling act herein before recited, in regard to the more efficient government of the cities and towns of the Commonwealth.
An admission that the act is constitutional to the extent to which it is approved by the counsel of Chahoon, goes far to admit that it is constitutional so far as concerns the question we are now considering.
But we clearly think that it is constitutional to that extent also. The legislature had a right to say to those persons who were performing the duties of civil offices under appointments made by military power or otherwise prior to the re-admission of the State : “We will sanction what you have done according to law, and will authorize you to continue to perform the duties of your offices until other persons are appointed and qualified to perform them. But we choose to appoint other persons to perform them until elections and appointments can be made under the constitution, and we therefore pass the enabling act for that purpose.”
*712 It is contended that the schedule annexed to the constitution contains provisions, which show that its fraintended that a person who was performing the duties of mayor of a city at the time of the adoption 0f tbe constitution, should have authority to continue . . ^ to perform them until a successor is appointed and qualified, at the time and in the mode prescribed by the constitution. But certainly this argument is founded on a very strained inference, and cannot be sufficient to show-•that the enabling act is unconstitutional.
The preamble and first section of that schedule show the only purpose for which it was adopted, and that it was not intended to secure to incumbents then in office, any immunity in their offices, or power to continue to hold them for any length of time, against the expressed will of the legislature to the contrary. “ That no inconvenience may arise from the changes in the constitution of this State, and in order to carry the same into complete operation, itis hereby declared,that” is the language of the preamble. Thus plainly showing that the convention was looking to public convenience, and not to the private interest of individuals in continuing to hold office; that it was acting in this matter, solely because there might be necessity for some such action before it could be taken by the legislature; and not because they intended to place this matter beyond the reach or control of the legislature. All the- safeguards that were deemed necessary for the conservation of private rights were embodied in the constitution itself. The only office of a schedule is to provide for a transition from the old to the new government, and to obviate inconveniences which would otherwise arise from such'transition. The convention acts in this matter as an ordinary legislature, and only because there is'necessity for such action before a legislature can or will be convened under the constitution. To be sure if a convention, in framing the schedule, should plainly show an únten *713 tion to place any of its provisions beyond tbe control of the legislature, such provisions being the act of the representatives of the sovereignty of the State without any constitutional restrictions, would be as effectual . and binding as if they were embodied in the constitution itself. But unless such an intention plainly appears, the presumption is, that the provisions of the schedule are subject to future legislation. The language of the 1st section of the schedule is: “ The common law and the statute laws now in force not repugnant to this constitution, shall remain in force until they expire by their own limitation, or are altered or re. pealed by the legislature.” Thus expressly affirming the control of the legislature over the subject (though such an express affirmance was unnecessary). There seem to be two provisions of this schedule which are relied on by the counsel for Chahoon as tending to show, that the convention intended to continue the mayor in office until his successor is elected and qualified under the constitution.
One of these two provisions is that contained in the 2d section, which declares, among other things, that all rights of bodies corporate, and all charters of incorporation, shall continue.” And it is argued, that this provides for the continuance of the office of mayor and of the officer for the time being himself in the office, as rights of the body corporate, under its charter. But how long was this continuance to last ? Always ? Certainly not; for that would have been against an express provision of the constitution itself, which declares, that “ there shall be chosen by the electors of every city a mayor.” Then the continuance was to be either for some specified period, or until otherwise provided by law. There is no specified period, unless it be the day named in the constitution in regard to the general election. But there is nothing in the schedule which confines the provision to that day, and the presumption *714 is, for reasons before stated, that the provision is subject to the control of the legislature. There is no conceivable reason why the matter should be placed beyond such control. Municipal corporations in their police, which is in fact a part of the police of the State,. are subject to the control of the legislature, like any other part of the civil government.
The other of the two provisions, before referred to, is contained in the same section, and is that which declares, that “ the several courts, except as herein otherwise provided, shall continue with the like powers and jurisdiction, both in law and in equity, as if this constitution had not been adopted, and until the organization of the judicial department of this- constitution.” It is argued, that the mayor’s court is one of the courts contemplated by this provision, and was therefore intended to be continued; that the word “ court” here embraces the judge of the court, who is the mayor; and that therefore it was intended to continue the mayor in office. It may be answered, if a mayor be necessary to hold one of the courts here intended to be continued, it is not necessary that any particular person should be such mayor; but the court may be held by any person whom the legislature may appoint to take the place of him who was the incumbent of the office when the constitution was adopted.
But the true answer is, that while the convention may have intended, in the former part of the section, to continue the then acting mayor in office until otherwise provided by law, it did not intend to include the mayor’s court, much less the mayor himself, in the word “courts,” used in the latter part of the section. They are courts of record, which the mayor’s court is not. They are the courts, whose organization is provided for by the 6th article of the constitution concerning the “judiciary department,” or such of them as existed under the old constitution; that is, the Court of *715 Appeals, Circuit courts, County courts, and Hustings • o courts. These courts were to continue, except, &c., “ with the like powers and j urisdiction, both in law and in equity, as if this constitution had not been adopted, and until the organization of the judicial department of this constitution.” An immediate organization of that department was contemplated by the constitution, which provided, that the judges should be chosen by the joint vote of the two houses of the general assembly; and though their terms of office were not to commence until the 1st day of January next following their appointment, yet it was provided that they should “ discharge the duties of their respective offices, from their first appointment and qualification, under this constitution, until their terms begin.” This was “ the organization of the judicial department,” referred to in the schedule, and plainly it has no reference to a “ mayor’s court,” which is no where mentioned in the constitution, nor to a mayor, who could not be chosen under the constitution earlier than the 4th Thursday in May, nor enter upon the duties of his office until the 1st day of July.
In construing the constitution, and the schedule and election ordinance annexed, in the light of all the surrounding circumstances under which they were made, we think it obvious that the framers of the constitution, purposely omitted any provision that the persons then performing the duties of office in the State should continue to hold over, until their successors should be elected or appointed and qualified under the constitution ; and that they intended that those offices, except where otherwise expressly provided in the constitution, should be immediately, or as soon as convenient, filled by the legislature; either directly, or in a mode to be prescribed by law. Almost all the offices were then held by men who were disqualified to hold office by the very terms of the constitution itself as originally *716 framed. It was contemplated that there would be a very short interval between the adoption of the con- and a session of the legislature under it, when ° all the offices could at once be filled. The convention ci0sed its labors on the 17th day of April 1868; and by an election ordinance then enacted, it was declared that the constitution adopted by the convention, should be submitted for ratification on the 2nd day of June 1868, to the voters of the State; that an election should be held at the same time and places for members of the general assembly and for all State officers to be elected by the people under the constitution; that the officers elected should enter upon the duties of the offices for which they are chosen as soon as elected and qualified in compliance with the provisions of the constitution, and should hold their respective offices for the term of years prescribed by the constitution, counting from the 1st day of January next, and until their successors are elected and qualified. And that the general assembly elected under said ordinance should assemble at the capitol in the city of Richmond on the 24th of June 1868 : And the commanding general was requested to enforce the said ordinance. Had all these things been done as contemplated, the legislature, which would doubtless have been composed of many if not most of the persons who composed the convention, would probably have filled at once, by a new election or appointment, all the remaining offices of the Commonwealth, and provided that the offices so elected or appointed should discharge the duties of their respective offices, “from their first appointment and qualification,” as provided in the constitution in regard to the judges, or “ as soon as elected and qualified,” as provided in the election ordinance, in regard to members of the general assembly and all State officers to be elected by the people under the constitution. And thus the ship of state would have set out on her new voyage with an entirely new crew.
*717 If we be right in this view, then it follows, that not only is there nothing in that part of the enabling act now under consideration opposed to anything in the constitution, but it is in conformity with the intention of the framers of that instrument.
"We are therefore of opinion, that so much of the enabling act as authorizes the appointment of councilmen and mayors of the cities, is constitutional.
As to the argument that the enabling act itself confirms the title of the incumbents in office; a sufficient answer is, that whatever right or title that act may give is expressly limited by its terms, and extends no longer than the period when the legislature might otherwise provide; and they did otherwise provide by the enabling act, in regard to the appointment of councilmen and mayors of the cities.
And as to the argument founded on the supposed general principle of law, “that a change in the organic constitution of government does not vacate the old offices until successors are duly qualified;” the answer is, that even admitting this to be so, “successors are duly qualified,” within the meaning of this proposition, whenever persons appointed to fill the offices by the legislative power of the new government are duly qualified.
The incumbents of office at the time of an organic change of government, continuing to hold over after such change (in the absence of a provision of the new constitution, or of an act of the legislature of the new government giving them such authority), hold by sufferance only and upon a principle of public necessity or convenience, not in virtue of any individual or private right. They cannot set up any claim against the legislature, which has ample power to put an end to their official authority at any time, and appoint others to take their places, subject only to any constitutional restrictions which may plainly appear to exist.
*718 "We have now, we believe, noticed all the grounds taken in argument by the counsel in this case, unless be the ground, that by reason of what are called “the fundamental conditions,” on which the State was admitted to representation in congress, we have only advanced from a provisional to a provincial State, and have not yet gotten back to our original position as one of the sovereign States of the Union. "What may be the meaning and effect of those conditions, is a question which does not arise in this case, as we have endeavored to show that the right of the old incumbents to continue to hold their offices is not made one of those conditions. It may not, however, be out of place, to say, that we regard Virginia as one of the sovereign States of the Union, and as the co-equal in every respect of Massachusetts, New York, Pennsylvania, or any of the Old Thirteen.
We have delivered a very long opinion in these eases, not because we have had any doubt or difficulty in deciding them, but because of the great importance of the question involved, the ability and earnestness with which it has been discussed, and the excitement which it has produced. If our decision shall have the effect of settling the question, and restoring peace and quiet to the city of Eiehmond, we will rejoice to have had an agency in bringing about so desirable an end.
The result of our opinion is, that on the 17th day of March 1870, under and by virtue of the act of the general assembly, approved March 5th, 1870, commonly called “ the Enabling Act,” Henry E. Ellyson became the lawful mayor of the city of Eiehmond, and has ever since been, and is yet, such mayor; that the petitioner, Archibald Dyer, was lawfully required by said Ellyson, as such mayor, to give bail, as mentioned in the petition of said Dyer, who is therefore lawfully in the custody of William E. Martin, as such bail; that George Chahoon has not been mayor of said city since *719 the said Ellyson became lawful mayor as aforesaid, and had no authority to issue the warrant of commitment, mentioned in the petition of John Henry Bell, whose imprisonment is therefore unlawful; and that the said petitioner, Dyer, must be remanded to the custody of his said bail, and the said petitioner, Bell, must be discharged from imprisonment.
The judgment is as follows:
This day came again the parties by their counsel, and the court having maturely considered the petitions, writs of habeas corpus, and returns thereon, an agreed statement of facts filed, and the arguments of counsel in these cases, is of opinion, for reasons stated in writing, and filed with the papers, that so much of the act of the general assembly approved March 5th, 1870, commonly called the Enabling Act, as provides for the .appointment of councilmen of trustees, and mayors .and other officers of cities and towns, is constitutional; that on the 17th day of March 1870, by a due appointment and qualification under the said act, Henry E. .Ellyson became the lawful mayor of the city of Richmond, and has ever since been, and is yet, such mayor; that he had authority as such to require the petitioner, Archibald Dyer, to give bail, as mentioned in the petition of said Dyer, who is therefore lawfully in the custody of "William E. Martin as such bail; and that George Chahoon has not been mayor of said city since the said Ellyson became lawful mayor as aforesaid, and had no authority to issue the warrant of commitment mentioned in the petition of John Henry Bell, who is therefore detained without lawful authority. It is therefore ordered that the said Archibald Dyer be remanded to the custody of his said bail, and that the said John Henry Bell be discharged from imprison- . ment.